# THOMAS BROWN

### *vs.*

## CLEMENT BECKETT Et Al.

1. The earnings of the wife, and whatever has been purchased with it belong to the husband, and are liable for his debts.
2. The relation of husband and wife cannot exist between slaves, although they live together as such, and children are born of their union; nor can their continued cohabitation after emancipation raise, as in other cases, a presumption of marriage.
3. Defendant claimed under a deed of settlement made by one trustee to another, both of whom were strangers to her for her benefit the deed was not signed by her, but in it she was described as the wife of B.
*Held,* That she might claim under the deed without being estopped to deny that she was the wife of B.
4. In equity technical estoppels are not known, but proofs of that sort are considered as evidence to be received if competent, and considered only for what they are worth.
5. In civil, equally as in criminal cases, where the question at issue is the existence of a marriage, the affirmative must be made out by the party who asserts it.

Special Term. Equity. No. 583. Decided November 19, 1867.

BILL by a judgment creditor to set aside an alleged fraudulent conveyance.

THE CASE is stated in the opinion.

MR. R. P. JACKSON for complainant.

MR. C. M. MATHEWS for defendants.

MR. JUSTICE WYLIE delivered the opinion of the Court.

This is a creditor's bill by complainant to obtain a decree to set aside a deed by which the legal estate in two lots of land situated in Georgetown, was vested in Joshua Riley in trust, for the use of Mary Beckett, the alleged wife of Clement Beckett, for her life, and after her death for her children, and for the sale of the said lots, on the ground

that said deed to Riley is fraudulent and void as against the creditors of Clement Beckett.

On the 10th of December, 1863, complainant obtained a judgment in this Court against Clement Beckett for $552.96 with interest until paid, and $35 costs, on a debt which had been incurred as long before as 1855.

Richard Cruit and A. B. Berry, other judgment creditors to the aggregate amount of about $300, have also come in and proved their claims before the auditor.

The two lots in question were originally purchased in the name of Clement Beckett, and cost $125, of which sum she paid $50, and he $75, and the deed was made to him.

Improvements were erected on the property, which greatly increased its value, but they were all paid for by her, from her own earnings; and there is strong evidence in the case that she not only clothed, fed and supported the children, but Clement himself, who was, and is, an inefficient and thriftless person.

On the 16th of November, 1854, Clement conveyed the lots to Hugh Caperton, Esq., in trust to secure a debt of $1,500, which he owed to the firm of Wheatley & Morrison, of Baltimore. This debt, to its last dollar was paid by Mary Beckett from the proceeds of her own earnings, with which as she was able, she took up not less than twenty-two small notes, which Clement had given in evidence of the debt. All her small earnings were deposited by her with Mr. Orme, the agent of Wheatley & Morrison, and as these amounted to enough from time to time, she paid off the notes in their order, and we have them filed as proofs in the cause, showing how much may be accomplished by industry and frugality, even by a poor colored woman but recently emancipated from slavery.

The lots at this time, together with the improvements, were not worth anything like the amount of this debt. Having paid off the debt, however, a deed was made by

Mr. Caperton, conveying the lots to Joshua Riley in trust for Mary Beckett, wife of Clement Beckett, as she is there called, for her life, with remainder to her children in fee. This deed is also executed by Wheatley and by Morrison, the late creditors, and by Clement Beckett himself, but not by her; nor was it necessary it should have been executed by her, and it is dated 17th of May, 1859.

It is this deed which the bill in this cause charges to be fraudulent and void, as against Clement Beckett's creditors, and asks to have set aside, that they may have the property sold as his property.

Since the date of this deed she has made still further improvements upon the lots, consisting of two houses, proved to cost from $600 to $800. Of this Clement paid not one cent. During the war she washed at the Seminary Hospital in Georgetown, and realized in this way from $50 to $100 a month. This is proved by the testimony of Mr. Cornell. She herself says, in her answer, that during the war she made in this way the handsome amount of $4,000, with which she was enabled to pay for these improvements besides supporting her family, Clement Beckett included. Still we are bound to decide that however worthless the husband may be, all the earnings and the savings of the wife are his, and although with these she may have supported, fed and clothed him as well as herself and children, and bought property and built houses, they are his, and therefore liable for his debts; and if she has even paid off incumbrances upon the property to an amount exceeding its value, that will not save her, but the deed which proposes to secure it for her use, must be set aside as fraudulent and void as against creditors whose claims were in existence at the date of its execution.

That, to be sure, is a kind of fraud on which even a court of equity must look with allowance, whilst it is compelled to set aside the deed in obedience to a great public and gen-

eral policy, which, upon the whole, tends to the suppression of fraud.

But in the present instance we are relieved from the necessity of inflicting individual wrong, as the price exacted for the preservation of this general policy. Mary Beckett, as she is called in these proceedings, was not the wife of Clement, and her earnings and property are therefore her own.

The evidence in the cause shows us that as early as 1836 they were both slaves, owned by different masters in George-town. They came together and lived with each other as man and wife, and children were born to them. Yet they were not man and wife, for slavery was then the law of this District, and to that code the relation of husband and wife was a stranger.

On the 22d of August, 1838, Clement received emancipation from his master, Mr. Joshua Pierce, and on the 5th of June, 1844, Mary obtained her certificate of freedom from her master and friend, Mr. Jeremiah Orme. They continued to live together, after their emancipation, just as they had done before it. There is no evidence in the case that they were ever formally married. In such a case, as there was no possibility of marriage between them in their slavery, so their continued cohabitation afterwards can raise no presumption of that relation, as in other cases. The presumption, indeed, is quite otherwise. It is only a question of presumption in any case, and in this the presumption is met and rebutted by the facts which explain the nature of their relations to each other in the beginning, and which assumed no new character afterwards.

The marriage license record, kept in the office of the clerk of the Court, contains no evidence of any license ever having been taken out by these parties. The certificate made by the examiner by whom the evidence in this cause was taken down, does state that Mr. Jackson, the counsel

for the claimants, produced before him what purported to be an extract from the marriage license record, showing that, under date of 9th December, 1846, the record of a license to marry was issued to these parties. But I have had that record itself brought before me, and have myself carefully examined it, and have failed to find any such record under that, or under any other date. It is true that under date of the 8th of December, 1846, there is the record of a marriage license issued to " William Beckett and Caroline Slater (Blks.)," but that will not do for the case of Clement Beckett and Mary Slater. But complainants, for the purpose of creating, as they say, an estoppel against her on this point, have produced the deed of settlement already referred to, from Hugh Caperton to Joshua Pierce, in trust for Mary Beckett and her children, in which she is described as wife of Clement Beckett. But the deed was not signed or sealed by her, and is therefore not an admission of that fact on her part, although she claims the property under the deed. In equity technical estoppels are not known, but proofs of that sort are considered as evidence, to be received, if competent, and considered only for what they may be worth.

In the present instance the conveyance of the title was made by one trustee to another, who were both strangers to her, and for her benefit, because she had paid off the debt to Wheatley & Morrison with her own money. She is described in the deed as Mary Beckett, wife of Clement. It is not her acknowledgment, but only a *descriptio personæ*, used by the grantor, which, if erroneous, may easily be accounted for, but ought not to have any influence as an admission to her prejudice. Besides, we must consider that she was an illiterate colored woman, recently a slave, and likely to have but little knowledge on the doctrine of estoppels, and caring only to have the home secured for herself and children, which she had paid for so laboriously.

*33*

Five depositions, and five only, have been taken in this case, and they all prove that Mary Beckett, as she is called, borrowed money, and gave notes in her own name; kept a money account with Mr. Orme in her own name; purchased property in her own name; built houses and rented them out in her own name; and in general, and in all respects, held herself out, in matters of business, as an unmarried woman, and was so treated and practically regarded by the world.

Finally, we have the solemn answer of the parties under oath, that they never were married subsequently to the acquisition of their freedom. If their marriage, prior to that event was impossible under the laws of slavery, their relation to each other was only that of concubinage, and its character has not been changed since by any act of theirs.

Neither of them could maintain a suit for divorce from the other on account of any violation of the obligations of matrimony; and if either were now to marry, no indictment could be sustained for bigamy in such a case; not because merely that in such cases the law requires the marriage to be positively proved, but because in this case no marriage ever was contracted.

In civil, equally as in criminal cases, where the question for decision is the existence of a marriage, the affirmative must be made out by the party who asserts it. In both cases it is alike a question of evidence. *Consensus non concubitus facit nuptias,* and *concubitus* alone is often but slight evidence of a marriage, and may be met and overborne by other evidence, of which the present case furnishes a very strong illustration.

I speak not now of that class of cases in which, to prevent the commission of fraud, a court of equity will hold a party to his representations, although they may be false in fact. For example, a man who has represented to the world that a particular person is his wife, will be bound to answer

as husband for necessaries furnished her as his wife, although she may not be such in fact. In such cases, however, it is not a question as to the fact of a marriage between the parties, but one of prevention of fraud attempted on the part of the ostensible husband.

The injustice threatened to be done to this poor woman and her children by seizing on the fruits of long years of her labor, economy and thrift, and applying them, a second time, to the payment of the debts of a thriftless husband, whom she has herself fed and clothed and sheltered, because he was the father of her children, may, fortunately, be averted without the violation of any of the established rules of the law.

*The bill is dismissed with costs.**

---

*No appeal was taken in this case to the General Term.